Case No. 16-5259. Standing Rock Sioux Tribe Appellant, Cheyenne River Sioux Tribe v. United States Army Corps of Engineers and Dakota Access LLC. Mr. Halberman for Appellant Standing Rock Sioux Tribe, Mr. Masonette for Appalachian U.S. Army Corps of Engineers, and Mr. Estrada for Appalachian Dakota Access LLC. Good morning. Nice to be in court. My name is Jan Hasselman, and I have the honor of representing the Standing Rock Sioux Tribe today. I'd like to reserve three minutes of my time for rebuttal, if I can. I'm going to focus my time on the legal issues and the balance of harms, but before I do, I'd like to say a few words about the unique context in which this motion arises, and in particular, how much has changed since we filed our preliminary injunction motion with the District Court. We asked the District Court to enjoin a pipeline. We're not talking about that anymore. We're talking about a very narrow injunction in an undeniably special place, a place of great historical, ceremonial, and religious importance to the Standing Rock Sioux. And the government has agreed that we have... But that's not sufficient for the issue that's in front of us, right? Well, it's certainly relevant to the issue of... It's relevant, but it's not sufficient, right? Well, no. We certainly have to... What's sufficient? What's the particular issue we need to resolve? Well, we talked about the legal issue on the merits, which is the scope of the government's consultation obligation under Section 106 of the National Historic Preservation Act. And if we thought the February 17th letter was an invitation to consult, what happens to you then? What happens to the tribes? Well, was there a consultation? Yes, there was a consultation. There was a discussion. The fundamental problem, and the district court focused very closely on the record of correspondence, but the fundamental problem was that the Army took a very narrow view of its consultation obligation. That didn't include any of the pipeline route. It was willing to look at the hole in the ground and the access road leading up to the hole. Is that the error? I mean, there was consultation regarding the section of the pipeline that crossed the water, right? Yeah. But that's not your argument. Your argument is that there should have been more consultation, but the section of the pipeline that led to the crossing, is that it? On either side of the crossing. On either side. And the section of the pipeline... What's the source of the Corps of Engineers' obligation to consult beyond the actual pipeline that crossed the water? So the sections of pipeline that led to the crossing and from the crossing. Where does that come from? It arises under the statute, which defines undertaking broadly to consider a project under the direct and indirect jurisdiction. It arises under the advisory council regulations that say we have to look at indirect effects. Now, nobody disputes... Indirect effects. How does... Indirect effects of what? So the Army Corps needs to make... Indirect effects of the pipeline that was laid across the Corps land, right? Right. So there's the direct effect of their decision is the pipeline underneath the water, under Lake Oahu. Right, right. The indirect effect is that there's a pipeline emerging from that... How do you know that that's an indirect effect? Where do we get that from? Because that's in the regulations. Where is that in the regulations? It's cited in our briefs, specifically 16 CFR 800.16B. It talks about indirect effects. There's no question. There's an obligation to look at indirect effects. The question I have, and I'm not making a point, I really want you to educate me, is are we talking about indirect effects that come from the section of the pipeline that was clearly under Corps jurisdiction, or are we talking about indirect effects of sections of the pipeline that were not part of the Corps jurisdiction, that were on private land that led up to the crossing of the river and the water and away from? Which are we talking about? So there's no party here that disputes that we need to look outside of the Corps' direct jurisdiction. Their jurisdiction is the water, and if they were limited to the water, we would only be looking underwater for cultural and historic resources, and as Dakota Axis said, that would be ridiculous. We know that we look outside of the water. Here, the Army Corps took kind of a doctrinal position that it wasn't going to look at any of the pipeline, and I want to make sure you look at the Corps' attachment five, figure 11, which is ECF page 161. I have copies if they would be helpful to anyone. None of the pipeline route is part of the review, and that is exactly the area where the tribal cultural specialists identify sites of great religious importance. Aren't there two levels of consultation, and I'm not sure that the briefs are very clear about this, but there's an obligation to consult precisely over this issue, the issue of what is the scope of the area in which there will then be consultation regarding whether there are potentially historic sites, and so there's two stages. One is duty to consult over scope. Two is once scope is established, duty to consult over the existence or not of potentially listable sites. I guess I think of it as different stages in the same process, that the NHPA prescribes a very formal stepwise process of identifying, evaluating historic properties, and I think that a consultation on the scope of what is subject to that is part of the process, and that was where the process stalled. All of the conversation between the tribe and the Army Corps was about the scope, not I shouldn't say all, but a significant portion was about the scope. We wanted to be looking more broadly, recognizing that this is an area of very great importance to the tribe here at Lake Hawaii. You're saying there was consultation on the scope. I thought there was no consultation. There was a disagreement, but no consultation. The Corps said, here's what we think is covered. Talk to us about what you find in that. Right, and we said, no, you've got it wrong. Yeah, in February 17, 2015, and I'm going to mispronounce her name, Martha Cheatley offered the tribe to consult about the scope. There was a clear invitation to come and talk about the scope. Then in July, the Corps announces that they have this very narrow view of the scope, but I don't think they can be faulted for failure to engage the tribe. So it's a procedural problem of there wasn't a conversation because there was a conversation. There was an invitation for the tribe to participate in agreeing on the area of potential effects, whether that invitation was accepted or not, the nature of it, I'm not certain. But in July, the Corps announces this narrow scope, and that's what you take issue with? Yes, it's do you look past the water's edge at the pipeline route, and that pipeline route, not even one yard of it coming out of the hole in the ground. How far down the pipeline route do you look? If you're going to go beyond the section that's crossing the water, how far do you go to look for these indirect effects? Well, our position in the administrative process was that given the amount of water, and the record before the district court was that there was close to 800 different waters, streams, rivers, wetlands in the 350 miles in North Dakota. Given the ubiquitousness of the water, that you need to look at all those places in between them. That was what the ACHP said as well. We're in a different place now. We're not talking about the whole pipeline. We're talking about the area right around where the line is. I want to understand exactly what has changed. At one point, it seemed like in the exchange of letters that was happening here, that the tribe was basically saying to the extent you have this permitting authority for all of these crossings, you actually have jurisdiction over the entire pipeline. That's what some of the letters seemed to say. Now you say, well, at the time that they were disputing the scope, they were actually talking about the crossings within one state. Now I understand you to be saying, now we're just talking about the two ends on each side of the water. Is that right? Well, because that's all that's left, Your Honor. Okay. They've completed construction everywhere else. There's a few miles where they haven't bulldozed and graded, and that happens to be the area of greatest religious and cultural significance to the tribe. Now there are some important issues here. There's some issues of first impression. You didn't ask the court to enjoin the pipeline company, even though they had intervened, did you? We did, Your Honor. You did ask that? Yes. And when? When did that happen? That arose when we filed our motion. They weren't a party, so we weren't in a position to – But you subsequently asked? Yes. In the reply brief, we provided the district court with authorities. Now one of the things the district court said is that we hadn't shown irreparable harm because he didn't have authority over the interviewer to enjoin the interviewer, and that's just wrong as a matter of law. Dakota Access is a full party to this litigation. It's subject to the jurisdiction of the court to do equity and craft a remedy that meets the situation. So do you need to rely on the All-Rits Act? Do we need to rely on that to enjoin the company or the fact that they were intervening is a suspicion? My reading of the precedent, Your Honor, is that as a full party to the litigation, they're subject to the equity jurisdiction of the court. I have to go back to this because I'm not sure that I understand it. I'm trying to understand what's the dispute about the nature of the undertaking here. And as I read the regulation, it defines what an undertaking is. It says funding directly or indirectly supervised. Or it says or permit. So I'm assuming that what's happening here is under the court's permit authority, right? It's under the Clean Water Act, correct? So why would that go beyond just the water? Sure. So the Army court has to make a decision about whether or not to grant a permit at Lake Oahe. And, in fact, it has very broad discretion and the statutory obligation to consider the public interest and a number of other factors. The exercise of that discretion needs to be informed by full consideration of all the impacts of this decision, including the indirect effects of it, which means at least some portion of the pipeline outside of its jurisdiction. Again, nobody disputes that. Nobody disputes that, and so it's not that helpful to point to that. We need more specifics about it. We've been told 20 miles on either side. It sounds like a lot of that 20-mile area is now moot. Can you tell us exactly what is not moot, and then we'll talk about what your legal theory is for reaching that? What's the scope of the area that you want covered by an injunction, and that still has not been bulldozed, and what's your legal theory that differs from the other side, since you all agree that it's something beyond the underwater? So it's challenging because every day it changes a little bit, at least until the court entered the administrative injunction. So there's a couple miles left. We know that the sections from the high- Both east and west? Excuse me? On both sides? It sounds like, and they would know better than me, it sounds like the east side is complete. So if that's true, there really isn't anything to enjoin over there. On the west side, we know that there are a couple miles left that haven't been bulldozed or graded yet. Some of it has been cleared, but that means that, you know, they've mowed it or removed large vegetation. That doesn't harm cultural resources. There are some areas, specifically the area around which Mr. Menses identified some sites that were bulldozed. They would like to get back in there and look for, you know, human remains. So an injunction in that area is important, too. But it's, you know, it's undeniably a small portion. Now they say, or believe, that that, the area covered by the Menses Declaration, is outside of the Pipeline Pass. So what's the theory that that's reached? There's a vigorous dispute around the facts around that. And Mr. Menses talked about the sites that he found, and he went back the next day and he looked there. So, you know, we're disagreeing with that. We're going to have to work that out at the district court level. Given that you now only have a small area that you're concerned about, how does that affect the equities when we're looking at the standards? Well, it affects the equities, I think, very significantly in a couple different ways. I mean, first of all, the government has acknowledged that the tribe has raised some good issues, and it's currently revisiting some of the decisions that it made. As of today, they do not have a permit to cross Lake Elahi. So all of the claimed economic harm associated with being unable to complete the pipeline are happening anyway. So it changes the equities in the sense that we're just talking about a narrow area of very undeniable harm. Where is that area? It can be more precise than saying narrow. Where is it? Well, so what we asked for in our injunction request was 20 miles. Right, but you're not asking for that now, I take it. Things have changed. You just said it's much narrower than that. Anything that hasn't been bulldozed. So Highway 1806 to the west side of the lake, is that it? That's clearly part of it. Beyond that? Anything further to the west of that? Yes, they have said, and they can tell you otherwise, that in one of their declarations, they say there's around three to four miles that haven't been graded yet. That's the critical area, and it's somewhere right near in that general area. And that's west of Highway 1806. Yes, that's right. Another question that I have, and I admit I have just started trying to understand how this process works, and so maybe I don't have it correct. But it sounds like part of the point of consultation was to point out to the Corps where there might be things of historic significance, correct? Absolutely. So I guess what I'm having trouble understanding is what has been identified that is in the area that's left? So if you're under the impression that the tribe maintains this huge GIS database of every burial and sacred stone feature, that's not the case. This was part of their treaty lands that were taken from them. There's a deep cultural knowledge about the significance of the area, but they can't pinpoint with GPS coordinates where everything is. And that's why they need to go and look. And what they asked for from the very first letter was, we need to be out on the landscape and be part of the process of looking. Because every time they go out and look, they find things, things that are not within the cultural knowledge. Dakota Access has hired archaeologists. So the key here is that they never had the opportunity to survey in the pipeline route. They were invited to come look at the hole in the ground, but they weren't allowed to walk the pipeline route, which was being proposed to punch through this area. And that's the critical issue. Let me ask you to educate me. Have you relied in any part of your argument on the Corps' regulations, their definition of the permit area and appendix C? Sure. There's a theory that suggests to me that that's an acknowledgement that the indirect effects go beyond the actual laying of the pipeline that crosses the water. Am I right on that? I think you are right. Have they disputed that? Or is that the point that you say everyone agrees that the indirect effects go beyond sections of the pipeline that cross the water? Everyone agrees now. In the district court, the Army's position was that we reasonably looked at only the direct areas of our jurisdiction, which is underwater. Their regulations say, yeah, you look outside, at least for some measure. So do the ACHP regulations. If that means anything, it means the area where Mr. Minitz found these sites. Let me make sure I get you. Your argument is that in the consultation, you think the consultation process was faulty because it did not take into account areas and sections of the pipeline other than that which was run under the water? Yeah, that's the case. Right. And the page I identified for you shows that in very stark relief. The pipeline route coming directly out of the hole in the ground was not part of the area of potential effects under the Can you tell me that page again, the one you're looking at? Yeah. Can I provide you with a copy? I have some. It's a Volume 1? It's the course attachment 5, which is the environmental assessment. And it's at figure 11, which is ECF page 161. That's a color map. Page 161, did you say? We're talking about attachment 5 in the joint appendix? Yes. The course attachment 5. Can I give you a copy of that? Sure. That's up to her. We can't find it. Yeah, my attachment 5 doesn't have any color. Yeah. I presume opposing counsel has this as well. So let me just circle back. You read the February 17th letter as an invitation to consult on the scope as well as on the content. Can you identify what attachment that is? There's a lot of that. I'm just trying to isolate whether you have a consultation objection on the scope or only on the substance. In other words, we had a discussion previously about whether the core said, come talk to us about what the scope is because we're about to get ready to fulfill our consultation duties. Or whether they said, here's the scope. Come talk to us about what might be in it. I'm just not sure what your claim is. Is your claim that they never invited consultation over scope? Or is your claim that they invited it, but they took the wrong position? I guess I'm agnostic on whether they invited it. I don't know that they invited it or not. We objected to the scope. And from the very beginning, they said, no, this is what we're looking at. Well, not from the very beginning. In the February letter, it doesn't define the scope and invites consultation of the scope. By July, they defined the scope. I'm looking for the letter. If you look in volume one of the Corps of Engineers opposition, it's attached to the letter. I heard it nine. Yeah, okay, I've got it. And it says, our regulations define the extent of federal action. It's a permit area. And then it says, please let us know if you'd like to consult on this undertaking. It's just, I'm just not sure how you're reading it. Because maybe you have two arguments, or maybe you only have one. You could have two saying, we have different positions. They never consulted with us about the scope. And, therefore, the burden was still on them to do that before we had to come forward with identification of sites. Or you could just be saying, yeah, they consulted with us, but we disagreed. And they're legally wrong. And then the consultation is founded on where the sites were. I'm just not sure. Yeah, I don't think the problem is focused on the process of talking about the scope. The problem is the scope. They got it wrong. The ACHP said they got it wrong. And all of the, you know, whatever opportunities that there were to consult were in this limited area that's highlighted in yellow and didn't include the pipeline route, the red line. And what about all the invitations by the Corps to consult on what they, the narrower area? I mean, the way the district court describes it, and there's record support for that, it seems like the tribe just didn't show up. The tribe took a position on principle that it wasn't going to go stand around and look at the hole in the mud and validate their narrow scope because that's the kind of thing that gets used against them. Now, there are plenty of ways you can preserve your rights in doing that, right? You can show up and say we're here for the limited purpose of identifying whether there are artifacts here that are significant, but we don't waive in any way our objection to the nature of the scope. That's not. Well, they preserved that objection. They said it over and over, that we need to look beyond the water's edge. And they were never given that opportunity.  I'm looking at what you identify as exhibit five, and it has areas on both sides of the water that are apparently Army Corps of Engineers federal lands. So when you say we all agree that the indirect effects go beyond just the pipe under the water, is that what the agreement is, or are you saying that you now agree that it goes further than that? Well, I think everybody agrees in principle that you go beyond the water's edge. But there's federal land on the water's edge, and so what I'm trying to find out is, well, and maybe I have to ask the court, but, you know, what's the scope of what you think everybody agrees to now? I think everybody agrees in principle that you don't stop at the water's edge. Our view is that if indirect effects means anything, it means this pipeline route, the dotted red line, that's moving through this area. Obviously, they don't agree. Why? So why indirect effects? I mean, where does it stop? How do we have an administrable principle of how far is an effect? And here we're talking about an effect of the permanent area, right? So they need to make a decision about whether this location is in the public interest, whether the permit to cross under Lake Oahe is in the public interest, and that has to be informed by some understanding of the impact on historic resources. And we said again and again, if you put a pipeline through here, it's going to have an effect. Okay, so I understand from the example in the core regulation that one of the ways you get beyond the crossing is that you back out to where the pipeline would pivot if you were going to go around the water altogether, right? There's a discussion of how, you know, these can be built without crossing particular waters. It's cheaper and easier to, you know, go with the crow flies. But if there's a reason, if there's a refusal of a permit, the obligation then would be for Dakota access to circumnavigate the lake. So is your indirect effects argument that pipeline is coming down, going to the water's edge, and if it would have to move up and circumnavigate the lake, every part of the pipeline just to that imagined fork in the road, that's the indirect effect of this licensing? Is that what you're saying? So could the core come up with a defensible justification? I'm asking you if you can come up with a principle that explains the extent of what falls within your indirect effect. What is the effect that is an effect of the government's permitting that is indirect? And how do we discuss that? If we're going to issue an injunction, we need to say where it stops. Well, if you look on this picture, you can see within half a mile of where the creeks are, it crosses another stream. And so our position was when there's 700 or 800 streams, rivers, and wetlands in 350 miles of pipeline, then you look at, you know, then it's all sort of determined by where the water, where it crosses the water. Their position is all determined by where it crosses the water. Go ahead. Well, yeah, and when it's every half mile, there's not a lot of flexibility. Now you ask the question where... That's a big scope you're now talking about. Except here, we're only talking about this small area. I think that's what we're trying to get at, some more precision about if we were to go with you, what's the injunction look like? Right, so we're... Where? Where's the area that... And that's not legal authority, and that's one thing to talk about negotiating with them. Right, right. But we can only act where we have legal authority and obligation to act. And I'm just not understanding where you're getting your legal theory. I mean, you say indirect, and you haven't given me any more. How do we know what's indirect? Well, I've told you what our position was, that where there's as many waters being crossed as there were here, then the route of the pipeline is determined by the location of those waters. Right, and I tried to tease that out, and you seemed to be resisting. I said, well, okay, then with respect to this crossing, if we hypothesize it not crossing the water, then the indirect effect is all the pipeline leading up to this particular crossing as distinct from where the pipeline would have veered north to go around the lake. And that gives you way more miles than you want, but you're saying no. So I'm just flummoxed. Well, it's the Missouri River, so I don't know when you have to turn the pipeline to avoid the Missouri River. What I do know is that we're talking about just a small area where if they don't get the permit to cross Lake Oahe, and that is under review, then they wouldn't be going here. Where would they be going? Ask them. Okay, we will. I'm sorry. My time is long up. Just one more question. Is your position, you said we were arguing, we were arguing, and we're trying to say we are arguing now. And I understand that part of that is mooted, and that's not your doing. So is your position that your legal theory is that there's an obligation under the Historic Preservation Act to review the entire pipeline, and that's your legal theory, and factually all that's left is this segment, or is it something less than that? So that is the legal theory with which we approach the district court, and what I'm trying to say is could a different answer have passed arbitrary and capricious review along the lines of what you said of not the whole pipeline, but some part of the pipeline that's determined by the location of the crossing? It might have, but that's not what we have here. We have sort of a rigid position that they weren't going to look at any of the pipelines except the direct effects. Let me ask you, so Dakota Access, in speaking about the affidavit by Mr. Mintz, suggests that their pipeline tracks the path of an older pipeline, and that any sites that he saw couldn't be historic, sacred sites, because this area has already been cleared. How do you respond to that? Yeah, there's a deep factual dispute about that. And what's your version? Well, Mr. Mintz was the first Tribal Historic Preservation Officer in the country. He's a highly respected figure. The implication of what they're saying is that he's either just completely making it up, or he doesn't know what he's talking about. No, no, I don't – I mean, I look at them already for themselves, but my understanding was that they're saying this was – 30 years ago, this pipeline was – there was a pipeline laid down here that was cleared and done 30 years ago. So anything that you're seeing there now is younger than 30 years. Right, so you don't put one pipeline on top of another pipeline. The route is generally parallel. It can be as far as 300 feet away. Nobody knows – it's a natural gas pipeline, not an oil pipeline. We don't know exactly where the route was and what was cleared, but Mr. Mintz is pretty certain about what he saw. So we have a real – you know, they put together some maps with no verification or authentication that we think are wrong and we're still trying to work on. Let me ask you another question. When we're thinking about the public interest here, what – you've identified factors for the tribe and their interest in this, just a significant interest. What do we make about other elements such as the pipeline workers who would be affected by any injunction? How are we supposed to balance those interests? Well, I think it's important to recognize that Dakota Access built a pipeline almost up to either side of Lake Elisa before it had a permit. It doesn't respect the permitting process and the obligation to consider alternatives. And if there are economic losses to them from that gamble, I think it's on them. They didn't have the permit they needed to cross Lake Oahe and they built up to the water's edge. Moreover, as we know, they still don't have the permit and the government is in the process of rethinking whether they should get one. So whatever effects are going to happen are currently happening anyway. And again, in the way that we've drawn this injunction very narrowly, it shouldn't have the broad effects that were before the district court. Thank you. Good morning, Your Honors. My name is James Smith and I'll be arguing today on behalf of the United States. So, well, let's get right to it. We agree with the district court that the court met and exceeded its obligations under the Preservation Act here. And you've seen the fundamental dispute between the parties is whether the court... There was a lot of ballyhoo with the press release. But I think at the district court, there was some suggestion that maybe the press release wasn't consistent with the legal position. So I'm happy to tell the court a little bit more about the joint statement. So on September 9th, the Departments of the Army, Interior, and Justice issued this joint statement. It's attachment to the tribe's papers. The joint statement's about the work at Lake Milwaukee. The pipeline company needs a Section 408 permit and an easement to run this pipeline underneath the core lands adjacent to the lake and under the lake itself. The 408 permit has already been issued. The easement has not. The court prepared an environmental assessment that addresses all of that. And I'm sorry, this is an easement because... Because it's land owned by the United States and operated by the court. Is that just coincidentally that at this particular site, the land is... I know the whole Lake Milwaukee project is. It's created by a dam further down. Oh, that's right, that's right. And so, you know, the Corps has to make a determination that... The Army has to make a determination that the easement is in the public interest and complies with federal law. And the 408 permit is a process where the Corps ensures that the pipeline is not likely to interfere with the operation of this project. This is part of the Missouri River system of dams. So... And as I was saying, the court prepared an environmental assessment that addressed both the 408 permit and the easement. But the easement hasn't been issued yet. And so what the joint statement tells us is that the Army is not going to issue that easement. And construction under the Corps' lands and under Lake Milwaukee can't go forward until the Corps reviews... Until the Army reviews the work that's done here. The work that's done. Let me tell you exactly what we're talking about. We're not talking about any of the permits anywhere outside Lake Milwaukee. We're not talking about all the various Clean Water Act crossings that go the whole length of the pipeline. And we're also not talking about the work that the Army has done under the National Historic Preservation Act. We already reviewed that work. We concluded that the Corps had done what it needed to do. And, of course, the District Court agrees. So what is the Army reviewing? It's reviewing the other claims made by the tribe. Because while this emergency motion for preliminary injunction was about the Preservation Act claims, there are a lot of other claims in the case. It's also reviewing the claims made by the Cheyenne River and Yankton Sioux tribes who have filed their own complaints. Are these NHPA claims? They're not Preservation Act claims. They're claims under the National Environmental Policy Act. They're claims involving Indian treaty law. So just make sure you said this, but I want to make sure I understand. You're saying the United States has not conceded in any fashion that it has erred in its treatment of the historic artifacts. That's exactly right, Your Honor. We continue to maintain we satisfy the Preservation Act and the District Court agrees. And what is your view of the scope? What is our view of the scope of the originality? Direct effect, permit area, there's some agreement at some core area, and there's some privilege to that agreement that tribes think this should be broader and you disagree. Right. So let me say just two things about that before I give you my full answer, which I absolutely will. But first, this issue has – the tribe did not really raise this issue during the motion on preliminary injunction. We didn't brief this issue on that motion. The District Court didn't understand the tribe in making this argument beyond the waters argument. The case has slowly transmogrified over the course of these emergency motions, but now this is the focus of their case. As I read the record, there's preservation of the less than whole pipeline but more than your site. And I don't dispute that. I'm sure the argument is preserved. I just don't know that it's properly on appeal here. The District Court didn't rule on that argument on the motion for preliminary injunction. Well, it rejected it. Well, it rejected the whole pipeline argument, but it didn't get to this issue of exactly how far does the core have to look. But it did not enter any injunction for anything more than what you've already – Right. And I thought the District Court deferred to the assessment of the core that the only area that the consultation needed to occur on was the crossing. I'm not sure that the – I have to parse the District Court's opinion very closely to see, but I don't think that the court understood this issue the way that it's being presented here now. And I say all this partly just to let you know that we don't have the whole administrative record here yet. We don't have the full body of everything the core did at each of these sites because, you know, this is our fourth emergency motion. We've been scrambling to try to put together a record which has necessarily been shaped by the claims that the tribe has fought. So we're just now pulling together all the documents that relate to this. But to answer the question directly, so what did the core do? Well, there are two sets of regulations. If this wasn't complicated enough, there are two separate sets of regulations for you. There's the General Preservation Act regulations promulgated by the Advisory Council, right, which – and we all agree that both sets require the core, under certain circumstances, to look beyond the direct impact and indirect effects. So there's the Advisory Council regulations, and then the core has its own set of regulations that explain how it applies the Preservation Act process for these long, linear projects like pipelines or authorizing crossings of jurisdictional waters. So those regulations apply at the various crossings that go up and down the pipeline. The general regulations also apply at Lake Milwaukee crossings. Now, both of those regulations under the – I'm going to interrupt you, but I don't want to get – Sure. It's just a question. What is the relationship between the council's regulation that talks about indirect effects and the core's definition of permit area? How do those relate? The council's regulations are more general. They don't have to address these specific issues, these difficult issues that are raised. Is it your position that when the core is defining the permit area, that they are, in fact, addressing the area of indirect effect? Right. So under the Advisory Council's regulation, it's actually called area of potential effects, right? Right, area of potential effects. So, yes, we agree. The permit area – the core calls it the permit area under its own regulation. When I read that, when I see permit area and the core regulation, I ought to be thinking area of potential effects. Same thing. I only highlight this distinction to illustrate how complicated it is and to make sure that the court's aware that there are subtly different legal standards here. I'm not sure how much difference it makes to what I'm about to tell you, which is how far did the core look? So, first, Lake Milwaukee. This is the diagram. So as you can see, the core didn't just look below the water. You can see the part of the pipeline is below the water. The core looked at also the area in purple, which are the core lands, and then the area in yellow. Now, the areas in yellow are on private land, but the court concluded that those – the work being done there was connected. So you can see there's a little square around the number 166, and then on the other side, those are the drill pads. They're going to drill deep under the lake to put this pipeline underneath. And then the yellow line going up to – it's up to Highway 1806. On the other side, that's the access road. So that's how the core defined the permit area – the area of potential effects for the crossing at Lake Milwaukee. Now, what the core then did was it drew circles around all this a mile out, and it looked for historic sites. Around? Around this irregularly shaped set of purple and yellow blobs. And I don't have my hands on it, but there is a diagram in the record of those, which I can see the pipeline company has, that shows those circles. This has been filed. If I can approach the bench, I can hand it to you. So that's how the core defined the area of potential effects, indirect effects, and the water's out. And what was the basis for that definition? How did they decide that? So it's described in the environmental assessment. You know, essentially, the core looks at where the work was necessary to support this crossing. So that's the areas in yellow. So this is the core's interpretation of their regulation in Appendix C? As it applies at Lake Milwaukee. In Appendix C? Yes. No, this is the application of the Advisory Council's general rights, because the Appendix C regulations apply to 404 permits. This is really about the easement and the 408 permit. Oh, okay. So Appendix C does not... Right. Appendix C does not apply to these areas. I'm confused. I'm sorry. I'm certain the problem is mine. But I thought you were saying that Appendix C is the core's effort to define area of potential effects. I did say that, yes. But only with respect to its permitting authority under Nationwide Permit 12. So these are done under other authorities as well. So it's a broader inquiry. Although, again, I don't know if that makes a particular difference. So they look for effects of the work at these sites. So they take that law. They apply it to the facts on the ground. They use their considerable expertise in engineering and construction to decide, will the drilling at that drill pad affect historic sites within the mine? They concluded that it would not. The State Historic Preservation Officer agreed with them and concluded that it would not. Now, you can... You can try part of that consultation? You can read the 20 pages that the district court used to explain this. The court invited the tribe for three site visits at Lake Milwaukee. There was an extended effort to consult with the tribe and to identify historic sites. But look, fundamentally, the drilling at... The tribe doesn't allege that the drilling on this yellow square is going to affect, for example, the METS site several miles up the pipeline. That's not their argument. You've heard their argument. Their argument is that, well, the whole pipeline is an indirect effect of these crossings. You have to look at the whole pipeline. What the court says is, this is the area of potential effects and the mile around it. Will any historic sites there be affected by the work at these sites? The answer to that is no, and the tribe hasn't shown that. It's arbitrary and capricious or found any way to connect the work at these sites to harm any specific historic site. So that's the answer. The court looked beyond the water's edge at Lake Milwaukee. So next up, we have all of the crossings, 202 crossings of jurisdictional waters that require pre-construction notice. So there are two of those in North Dakota. So for the ones in North Dakota, the court didn't just look at the jurisdictional waters. It looked 257 feet up the pipeline in both directions, and then it looked 100 feet across. So you have a box that's defined as a permit area, and this is applying those appendix C regulations. That's 514 feet plus the width of the crossing by 100 feet, so it's about an acre. And... Why did it do that? So that, Your Honor, turns on the analysis that you hinted at, which is, how does the pipeline turn? So here, the court applies those appendix C regulations, the specific parts of it that address the pipeline. And it does an engineering analysis of, how far would the pipeline have to divert across somewhere else? And that, in turn, is based on the width of the pipe and the engineering issues that are within the court's expertise. And so that led the court to this 267 feet number. I have the same question for you that I had for Mr. Hassell, which is, on consultation, was there consultation with the tribe over the question of what the scope of the court's inquiry was going to be, the geographic area on which the court was interested in hearing about potential sites? Certainly, there's a long history of letters in the record where the court, where the tribe repeatedly maintains their fundamental objection that the court should have assessed the effects of the whole pipeline. And the court explains why it didn't do that. So I don't understand the court's obligation here to be two separate obligations, one to consult on the scope and one to consult on the historic effects. I think it's one consultation on the effects of the undertaking on historic sites. So regulations are pretty clear that there are actually these two stages, that there's a duty to consult when the scope is established on. I'm not sure what regulation you're referring to, Your Honor. But in any event, the court invited the tribe to discuss the scope of this project. They obviously reached a fundamental disagreement about that quite quickly. When the discussion about, you know, inviting the tribe to consult what's going on, and the court was describing their jurisdiction in terms of the actual crossing. Were they describing it as this is now pictured? In other words, you know, were they talking clearly it's beyond the water's edge? But we don't agree with you that it's the whole pipeline. My understanding is that there were further discussions between the tribe and the court about the scope of the court's efforts at Lake Milwaukee. I don't know whether the tribe and the court had discussions about the 257 feet and exactly how the block it would draw around each 404 crossing. Just to be clear, the regulation I'm thinking of is the council's regulation, 800.4A1 and 4. So 1 says in consultation with the Tribal Historic Preservation Officer, the agency official shall determine and document the area of potential effects. And that's distinct from also in consultation gather information to assist in identifying properties which may be of religious or cultural significance. So the consultation is supposed to happen about determining the area of potential effects. I would have thought of that as one step in the overall consultation, but I'm not sure that the distinction was the difference. The reason I'm asking is because when I read the cold record and I look at the back and forth, it seems significant whose burden is it and has each side discharged their burden. If the court is not open to consultation on the threshold question, it becomes more understandable why the tribe would not be interested in getting into the weeds on where are the sites because they don't even think they've been consulted on the threshold question. But nonetheless, Your Honor, they could have maintained those objections and still provided information on sites in this area that they were concerned about. And, you know, the history of this project, you can look at the 20-page long discussion of the Corps' efforts to consult here. You know, other tribes brought concerns to the Corps. And, you know, I don't know that anyone was turned away because something was not exactly in the Corps' jurisdiction. I think the pipeline company and the Corps were willing to work with the tribe if the philosophical objections that the Corps had to look at the whole pipeline, then, I don't know, the Corps couldn't resolve that. And the Corps attempted to in that series of letters. But, you know, and again, the Preservation Act doesn't require the Corps to identify and protect every historic site. It requires the Corps to make reasonable good faith efforts to identify these sites. And I think especially the history laid out in the district court's opinion makes it clear that the Corps tried to do that and tried having a philosophical objection to the process. It didn't participate. I'm not sure why you're calling it a philosophical objection. I think they have a legal position. A legal position. Which you disagree. So what else can I tell you about looking beyond the water's edge? I guess those are the fundamental issues. And you've heard, I mean, so this is a variation on the arguments they made in their briefs during the motion for preliminary injunction. But, you know, in the end, it still comes back to the whole pipeline issue, right? Because they haven't told us, they haven't said, look, there's a historic site 500 feet from a crossing that you failed to look at. They said, you have to look at all the pieces in between the crossings. He said, all the places in between the crossings. So that's the whole pipeline. There's an issue also in the briefing about delegation of authority. That the Corps is basically allowing Dakota Access and its evaluation of the pipeline's potential effects on historic sites to trigger or not the Corps' consideration. What's your response to that, that that's an abdication of the Corps' responsibility? So it's clearly not true at the 202 sites where pre-construction notice was required because the Corps went through that process of independently verifying Dakota Access' conclusions that the work at those sites wasn't likely to affect any historic sites. And how did the Corps independently verify? So it verified, independently verified Dakota Access' conclusions, meaning? So it reviews the information that the Corps has, information provided by the tribes where they provided information, and the surveys prepared by Dakota Access for each of these 202 crossings that require pre-construction notice. And then there are what are called verification memos in the record that show you the results of that analysis. And so it's your position, you invited the tribes to go to all those sites and walk them with you, and they just didn't show up? No. So, you know, again, we have to remember the Corps doesn't control this whole project. The Corps controls only the crossings, only roughly 3% of the whole project. The Corps can't order Dakota Access to allow the tribes to survey the whole length of the pipeline. No, I'm talking about the areas that you surveyed in your jurisdiction. As I understand it, the Corps invited the tribe to inspect, and I may not have the command of the exact numbers, maybe 11 of the crossings where pre-construction notice was provided, and the Corps could obtain the consent of the private landowners to let the tribe onto the sites. But it did include all the crossings where pre-construction notice was required, and I don't think the tribe took the Corps up on that invitation. And remember, there's only two of those sites in North Dakota. There's more further down the pipeline. So, I'm a little bit confused about the private landowner issue. I mean, Dakota Access has an easement to go across all this private land, and isn't it part of their obligation under federal law to the extent that there's a need to do environmental impact or historic preservation analysis, that that comes with the territory? I don't believe, I mean, I'm not aware of a requirement that Dakota Access obtain an agreement that would allow the tribes to inspect, you know, each of the crossings authorized by the Corps. I'm not sure that's relevant here, at least in North Dakota. We've got two crossings. We've got Lake Milwaukee, where the tribe was invited, and the others on the other side of the state. Can I ask again, this very helpful exhibit that shows the radii around, help me to understand the legal basis for why those circles were drawn where they were again. These are not based on Appendix C, or they are? They're not. So, they identify the area of work that's connected to driving the pipeline under Lake Milwaukee, and then they drew a mile around it to cast a wide net. Why was a mile around it? So, I don't know that we have the full record for that. It's probably an engineering determination, right? How far has the drilling at that drill pad, how far will the vibrations and other effects of that reach? Well, that doesn't, I mean, for our purposes, doesn't it have to be that it's somehow related to the indirect effects? Yes, the indirect effects have to work in those connected areas. It does. What I'm trying to get at is how the Corps determines, back to the original issue, how the Corps determines what are indirect effects that go beyond the permitted area. It takes the general regulations and its Appendix C regulations and applies them to the facts on the ground, and it does what every agency does. It makes a decision that's subject to judicial review under the Arbitrary Accretion Standards. And it's a little bit more cross-reviewed if we don't, I mean, can you point us to anything showing that there was an engineering determination, that a mile was appropriate? I can point you to the discussion in, this is the one. So, these issues about Lake Milwaukee, at least, are discussed in the record we have so far in the environmental assessment, which is Attachment 5 to our papers. I have to confess, I don't know if there's a discussion of the engineering reasons and other reasons the Corps used a mile to look. My understanding is that they, well, it may be an issue that we need more of the record for. And as I've said, we worked hard to try to compile documents that are responsive to the tribe's claims, but they have shifted, as I think even opposing counsel acknowledged, and given the, let's see. Let's find the exact page for you, Your Honor. Are you looking, I mean, the cultural and historic resources are discussed at page 75 of the environmental assessment that we're looking for? Maybe. All right. Right, I think that's the discussion that's relevant to these issues. And again, Your Honor, I think it's worth noting that some tribes did participate in this process, however, and where they did, the Corps was, in many circumstances, able to accommodate their concerns, the Corps and the pipeline. You have said that the, that there is no easement has been granted. That's right. The government is rethinking this process and deciding whether they're going to grant the easement. So, presumably, nothing is going to happen until that decision is made. Right. So, the government's reviewing the work they did and determining whether they, whether that work is adequate or whether they need to do more work in light of claims raised by the tribe and the other tribes. Until that's done, and so, until the Corps issues, until the Army issues the easement, the pipeline company can't drill under core lands or under Lake Milwaukee. The Army's action here doesn't stop the pipeline company from working on other sites outside that Lake Milwaukee area, not as broad as the tribe conjunction, of course, which would run 20 miles up the river. The Army has said that this process of review will probably take weeks, but not months. If the Army concludes that it's done its work here in light of the claims, other claims raised by the tribe, then it'll issue the easement and then work can proceed under Lake Milwaukee. If the Army concludes that it hasn't done all the work it needed to do, then it'll have to do more work, but we don't know exactly what that work will be or how long it'll take because the Army's still in this first step determining whether its review is adequate. But nonetheless, our expectation is that the process will probably take less time than it would take to view this appeal, for example. So, I think while the Army's taking action here, it doesn't render the tribe's motion moot. Why isn't the council involved in this case? Why isn't the advisory council involved in this case? Well, the council has played the role that its own regulations provide for it. The advisory council's regulations put the burden on the court to determine the scope of its undertaking and the area of potential effects. The regulations don't give the advisory council a veto. What they do is they allow the council to submit its objections and then they explicitly allow the court to affirm its decision over the council's objections as long as it takes them into consideration. And here, you can see that process play out in the letters between the council and the court. You know, those letters aren't entitled to deference by themselves. If they were, then the process put on the regulations wouldn't make any sense. You said the regulations allow the court to affirm its decision notwithstanding the council's objections in that. You're referring to which provision? Well... Whose regulations? The council's or the court's? The council's own regulations. The council's own. Yes. Well, I'm going to be hard put upon to find that exactly for you, but it's in there. It's cited in our brief, Your Honor. All right. I'll find it. I'm happy to find it for you by the end of argument. Okay. So, if I can just... If I can wrap up just for a moment, Your Honor. I mean, the tribe's motion for injunction pending appeal should be denied. The court did its work here. It made a reasonable good faith effort to identify historic sites and to engage the tribe in consultation, and that's what the preservation act required. The tribe objects to the pipeline generally, but it hasn't shown that the scope of the work authorized by the court is likely to harm any specific historic site. Was there any consultation with the tribes about the one-mile radius area? I don't know the answer to that. Yeah, I didn't... I know that the court invited the tribes to walk the Lake Oahe site with them. But again... But I'm talking about the one-mile... No, I understand. I understand the question. I just don't know the answer to that. Again, we don't... That seems a pretty important fact here, doesn't it? Again, if the tribe had raised objections to it or concerns about it, then that's something the court could consider. But, you know, the preservation act gives the tribe a role here, but it also requires the tribe to structure its participation in a meaningful way. And just saying, we want you to analyze the whole pipeline, and we object to the process, didn't do that. Isn't that also a regulatory obligation if you find that the consultation is unfruitful to give notice of sort of the impasse? I should have that on my finger tips. But it's hard for us looking at this record to sort of see what you're calling consultation and when you declared it to be over and what the scope of it is. Well, I mean, I refer you to the district court table summary. The district court took 20 full pages to lay it all out in gory detail and, you know, highlight those letters where the court brought that process to a close. So, in any event, we believe the tribe's motion should be denied because it hasn't prepared its burden of either showing irreparable harm or the 60 other merits. All that said, while we oppose an injunction here, we have asked the pipeline company to voluntarily pause construction within 20 miles of Lake Milwaukee to give the Army time to complete the review that's described in the joint statement. And we still believe that kind of voluntary pause would be appropriate. You've asked? We've asked. What was the answer? Or we'll find out from the minister's side? Yes, I believe you'll find out. Okay. Thank you, Your Honor. Thank you, Judge Brown. And may it please the court, you will not be shocked to learn, Judge Griffith, that the answer is no. Let me start where we ended with what's a helpful comparison of the scope of the government's ongoing action and what's at issue in this case. If you look at the maps again, what is in yellow on the banks of either side of the river is the federal property that is at issue. It's a few hundred feet on either side. And so, therefore, the easement to the effect that this consideration affects this case is limited to the real property that you can see in yellow here, just a few hundred feet on either side of the river. We have, contrary to what counsel for the tribe said, all permits that we need in order to get to that point. And the only thing that is keeping us from working from those few hundred feet in yellow 20 miles out is the current administrative injunction. Mr. Starr, let me ask you, do you dispute that this court has authority to enjoin any further construction by the pipeline company? I'm not sure I understand the question, Judge Griffith. I think they have asked for an injunction at this point. But do we have authority? If we cited them, is there any jurisdictional bar to us enjoining the pipeline company from further construction in the area that they have? Meaning whether if you conclude that there is a violation of law and irreparable harm It's not the relief that the tribe asked for in this report. And therefore, it would strike me as an odd injunction to enter pending an appeal of an order that was directed to a different motion. I will say that it is true that counsel said that in the reply brief in passing, they said that we should be enjoined to. I don't believe that's the motion that you actually have on appeal. But if you conclude that that's a formal distinction, and that all of the other requirements of an injunction have been met, which is not the case here, clearly, I don't think jurisdiction as such would be an impediment. But I don't think it would be appropriate because it's not the motion that they brought in, and it would not be a motion. All this act gives us broad authority to preserve the status quo, however. And if we were to determine that the status quo is threatened, wouldn't that be sufficient authority on which we could enjoin it? I mean, if you're asking purely the question of statutory authority, keeping in mind that I'm not agreeing with you, that this is the motion that they brought below, and that I don't think there is a likelihood of the merits, irreparable harm, or that they went on the balance of the equities, there is a section of the U.S. Code that would allow you to enter an injunction. Thank you. Against the company. Against your company. If you consider that it is properly preserved, it seems to me that we're sort of going a little bit around and around. If they brought this motion in the district court. But I don't think that's the main issue here. Just briefly. Just let me turn to the point where the easement really has nothing to do with the work that we're being kept from doing 20 miles out because it's not determinist. And as we heard, you know, the government. Why not wait until you see whether you're going to get the easement? I mean, to a neutral outside observer, it looks like you're forcing their hand, right, by saying we're going to build right to the water's edge. Well, right to the water's edge, I take it means you're going to press ahead as far as you can, assuming that you're going to get that easement. Correct me if I'm wrong. Correct me if I'm wrong. I still understand, Judge Griffiths, how these projects work. We started this process more than two years ago. And along the way, we consulted with every regulatory authority, federal and state, including the Army Corps, with respect to relevant easements. Along the way, we have complied with the administrative process for the easement. But if we were to decide that the Corps was mistaken in the nature of its consultations and in the scope of its obligation about the areas to consult, not saying it's your fault, if we were to decide that the Corps was mistaken in that, then that could possibly affect the scope of the injunction, right? And it would say to the pipeline company, you can't build to the water's edge because that may be an area of potential effect. This gets to the question of the likelihood of success on the merits. And let me just say quickly that the right that is being asserted is purely a procedural right to consultation. And that, I think, is absolutely plain. It is also plain, Judge Pillard, to answer one of the questions that you asked earlier, that we have cases that tell us what happens when an agency denies you a right to a process that you believe you have. We know from Vermont Yankee that you have an obligation, even if you don't think that the agency is considering all of your objections, to put them in and make a record anyway. Because as the court said in that case, it is not the obligation or the job of federal courts to do on the back end, you know, the process that the agency should have done earlier. It's also clear, Judge Pillard, that back in 2015, it was very clear from the governing regulations and from letters sent on September 3rd, 2015, and others, that the agency took the position that the consultation area was smaller than the consultation area that the tribe was claiming. And we know from the Ohio Forestry case, also from the Supreme Court, that when an agency tells you they will not give you the procedural rights that you think you have, the case is ripe right then, if you have standing. Indeed, as Justice Breyer said, it may never get any riper. And this goes both to the likelihood of demerits and to the balance of equity. Because they knew way back when that the right they wished to assert was not consistent with what the agency was actually saying they had, they could have brought this to effect. But they did not. Well, I don't understand why the statement by the pipeline company that they will build, and I think this is a finding of the district court judge, that they will build to the water's edge, when we know there's a possibility that the easement will not be granted. This is all private property, Your Honor, and we have all permits that we need to build that. But if you're not going to get the permit to cross at the critical point, you're going to have to redirect the pipeline, right? Yes. But the question is... That's a gamble. You've made a gamble. If you wish to see it that way, we also have to consider that we have people on payroll. We have open ditches all over this area. We have equipment in the area that is being vandalized. We have it scheduled to build a pipeline in North Dakota with winter coming. If we believe in the regularity of government process and in the rule of law and in the assurances that we received all along from the Army Corps of Engineers that the easement was improper, was in process, and it was a formality now that the 408 assessment has been completed... Is that the language the Corps said, that the easement is a formality? We were sent all of the paperwork and said that it was up just merely on the desk of the final person for signature. It's not in the record, but if you're asking me why my client would want to do what I'm telling him he wants to do, it's because we continue to believe in the regularity of government. It's not formality now, is it? Well, we accept that the government has not issued it, but we also have a schedule and a construction date to meet. And to the extent that you're asking whether we can wait to build the 20 miles out other If we wait to build that to get to the point when we get the easement, we'll be further back behind on the back end for the entry into production date of the pipeline. What happens if you don't get the easement? What happens if you build and you don't get the easement? Well, that's our problem, Judge Griffith. But from the assertion of the legal rights at issue here, the client... has a legal right to an injunction because we may be foolish in spending our money. At the end of the day, if we have all the permits that we require in private property and we make the judgment that we can go off to the point where the easement will become relevant in the faith that the easement will be granted, and that will save us two or three It's a judgment that we're entitled to make, especially when the alternative is to lay off hundreds and hundreds of people who are highly specialized, who took this seasonal work in the faith that this all has been approved and who will not be able to provide for their families. When we already have open ditches and trenches and pipes on the side, when you said about the status quo, the status quo is that we're in the middle of building a pipeline and the equipment is getting damaged and vandalized and that we're losing every day. We're having to lay off people every day. All in a world in which there is no legal impediment for the construction that we want to undertake because we have every permit to go off to the point in private land for which we already have easements. That's part of the problem. Mr. Estrada, if the pipeline were to be rerouted, so this is a lake on the river, and I thought I saw a sample rerouting that goes across the river, I guess north of the lake. There was a environmental assessment much earlier on, Judge Pillard. There was an alternative route north of Bismarck that was considered, that was found to be more environmentally deleterious than this one. This gets me back to the point that Judge Griffith mentioned earlier, which is we made every effort to co-locate this pipeline with an existing pipeline. This is why some of these claims that are being made about artifacts in the pipeline right away are completely impossible and almost untenable. In any event, the routing of this pipeline was found to be the best and most environmentally sound option that was available. If it were to be rerouted, I'm just trying to understand in terms of these questions of the scope of the Historic Preservation Inquiry. If you were to take the alternative northern route, how far back on the pipeline that is currently mapped to cross the currently planned crossing would be not useful and where would it pick up? Let me say that the question suffers, with all due respect, with temporal disjointing because the consultation that bears on the routing of the pipeline is done two years ago, not at the point where the pipeline is completed. One, this is again my Evermont Yankee point. They were invited to consult in 2014, 2015. Just so that I don't leave this point on the table because I know I have very little time, in addition to the letter that Judge Griffith alluded to earlier from February, there was an earlier letter, September 3rd, 2015, from Colonel Henderson to the chairman of the tribe. In both letters, it is abundantly clear that we have conducted the cultural service of the entire pipeline route. In both letters, although the Army sets forth its legal position as to the scope of the required consultation, with which if the tribe disagreed, it was free to do, it also said this is the pipeline route. Let us know if you have any concerns. Not only that, I want to direct you to the DIPL declaration that we put in. DIPL was our tribal liaison. It very clearly sets forth that although this was not a legal requirement, we wanted to make every effort to accommodate the tribes, and we offered tribes to, also to the point that Judge Wheeler made earlier, access to the property, to walk the pipeline with their own cultural survey specialists. Three tribes took us up on that. The Arapaho, the Oswego, and the Upper Sioux. As a result of their intervention, at the time of the planning, when it was relevant, we made changes in the pipeline. I think one of the basic failings here is that not only was it a procedural right that was bypassed at the relevant time, but that we and the Corps gave the tribe every opportunity to point to important sites. There was abundant evidence that when tribes came forward, we accommodated them, even if there was no legal obligation. As a factual matter, not only were they provided the opportunity to consult, but they were given far more than the law actually required. This is why, as a factual matter, even if their legal theory had any pull, Judge Wheeler, the factual matter, or the likelihood of success on the merits, is completely missing. Now, let me... Mr. Oshawa, what is your view of the obligation of the Corps to consult with the tribe for areas of potential effects? What does that mean? What's the scope of that, areas of potential effect? Well, I think that that is, in part, and probably mostly answered by the answer that counsel for the government gave earlier. If I sort of could go back to the three circles map, we start with the proposition that the jurisdictional crossing is the Lake O'ahu cross, right? From there, based on the public citizen case from the Supreme Court and the regulations, there is basically a causation test. If we give you a verification, not actually a permit, but a verification to cross this, what are the necessary consequences that are doing that does for the area around you? The Corps basically makes a judgment that those areas are those that would arise out of the construction entailed in the approved activity, which is why you have the three circles, and I'll get to those in a moment, up to the point where it would be possible that the pipeline could have had another crossing. Ultimately, one of the reasons the legal theory on the whole pipeline fails is because the public citizen case tells us that everything else that happens upstream in the pipeline could not reasonably be considered a legal cause of the approval of this one crossing. It's just a question of predictive judgment and engineering expertise and how we went about doing this, and I'm sort of getting maybe a little bit into the weeds. If you look at the boreholes on either side of the lake, which is where the pipeline is going to go under, each of those is a center for one of the circles. If you look further, there's an access road that has to be put in for the construction, and the outer point of that access road is the other center of the circle. The expert judgment here is if we allow you to do all of this, you're going to bring forth construction that will affect at most this area. That was the legal judgment. That's what actually explains it. If you look at the letter that the Corps sent April 22, 2016, to Fern Swenson, this is where this map comes from, and it explains how they went about the area of potential impact on the basis of the construction effects. It's also very interesting because it also goes about areas that they identified that had historical artifacts that were outside the project area, but within that one mile radius. We already flagged these for the tribes. The letter goes on to point out that in those areas, this tribe consulted, and in the list of items that they highlighted, it was one of the ones that were outside of the construction area, but within the potential effect there. Although this is the area that the Corps actually examined, it is very clear from the record, if you take the very painful experience I had of diving into it in the last week, that what the Corps did was get into all of the possible consequences. By this, I mean the potential outdoor effects, not the, oh, this is definitely going to happen. It is as if I tell you, if you're building a fixed end constitution, do I need to worry about the dust and the noise and foxhole road? No. The Corps is looking at its experience of how these things are built, looking at what the activity is going to have to be with respect to the jurisdictional crossing, and looking up and around to see where that construction would affect up to the point where, in its judgment, there might have been a different process. Ms. Trichot, I think you answered this question, but you said that this map was provided to the tribe in a letter. This map was provided to the SHPO, S-H-P-O, April 22nd. Yes, but the letter that enclosed the map recites a consultation had with the tribe with respect to artifacts within the one-mile area, from which you may fairly infer that that was actually discussed with the tribe. Now, the other point is, we're all clear, and I think there was never any doubt, that to the extent we're talking about the effects legally caused by the permitting of that crossing, the Corps did not limit itself to the water's edge. It is true that it did not look all the way up the pipeline, but it did provide the service that we conducted, cultural service of the entire length of the pipeline in the entire state of North Dakota and South Dakota, and those were made available to the tribes for comment or for expression of concern. This was in 2015, Your Honor, and there was never any effort to say, oh wait, although you're not legally obligated, I have this real concern, and we have affirmative evidence that tribes who took us up in our effort and walked the ground with us were actually accommodated. That goes both to the likelihood of success of the merits, excuse me, I'm sort of writing and also to the balance of the equities. Now let me just, thank you for counsel. He didn't give me the easement just yet, but he's partaking of the water. Thank you. Now, with respect to the other issue in the constantly evolving motion for this injunction, let me just say a couple of words about the Mint's declarations. First, the district court had three of them, I think, all of them in front of it for the hearing before he considered the application for the injunction, which he denied. We had a DRO hearing in which he did not rule on the specific question, but he did take our evidence and the maps, including maps addressing the co-location of the pipelines and how some of these things just could not be. And so the necessary inference is that as credible as the tribe might think Mr. Mint is with respect to some of these allegations, they were not credited by the fact finder and that cannot be clearly erroneous. But for the bulk of these sites, let me point out that if you read the declarations carefully, the sites that he identified lie outside of the work path of the pipelines. And he does not say otherwise, but he goes on to say that in his experience in seeing the pipelines built, I don't know how expensive that is, he is concerned that they might be endangered. So we have a whole bulk of sites that he himself concedes in his declarations are outside the right of way and outside of the construction area. I don't think the district judge was required to take his engineering judgment over that of the Corps of Engineers and others that he claims to have seen from afar because he was not allowed in the right of way and that in his judgment appeared to him to be graves. Then when we got to the TRO, we got to the allegation that he had done and that the things that he thought were graves had been bulldozed. Now, that allegation has now been investigated by the State Historical Preservation Office and found to be unfounded. That was, you know, the letter that we just got as a public record two nights ago and you got yesterday. Now, we have an answer to that letter yesterday with what I consider a somewhat improper affidavit in response to a 28-day letter from somebody saying, oh, that cannot be true and you bulldozed all of these sites anyway. And so, of course, they found nothing. But let me point out to you that that allegation in the 28-day letter, if you go back to the Mint's declaration in support of the TRO, you know, the two are inconsistent because Mint said that after we allegedly bulldozed these proposed sites, it was still important that he be given access because he was certain that there were graves and that he would find human remains. And part of the reason for the TRO was for him to be permitted to make appropriate religious observances for these graves. The TRO went there with seven archaeologists and found none of this. They are a government agency. They have expertise in this area. And to the extent that this is a he says, she says fight as to, you know, our survey say one thing and Mr. Mint says another, we do have a government expert agency that has looked at these specific allegations, including the specific allegations that graves were found, no evidence of that in the face of Mr. Mint's own claims that there would be evidence. And I think if I can just sort of finish once again, because I know that this can get a little bit confusing, but the fact is we are under a schedule every day and every month of delay that we extend into 2017. If we were enjoying construction between the west side of the lake and highway 1806, what sort of harm, how does that change your harm calculus? The west side of the lake? Well. So from the west side, if all we say is no construction from the west side of the lake and highway 1806. I think that would be effectively close to the administrative injunction that you enter only temporarily, because on the east side, the, you know, most of the pipeline hard work has already been completed. There's some electrical work that, you know, remains to be done. On the west side, we have done, you know, the clearing in the topsoil up to about two miles in, and so that's up to 1806, and that's two miles out, that is two miles out from the lake. And so if you are saying that the injunction would cover west of 1806. No, east of 1806. Oh, east of 1806. The west side of the lake. Oh, so there's two miles out of the lake. Well, I don't know what the legal basis on the basis of. No, I'm just asking the harm element, yeah. I mean, you know, the harm is just the same with respect to each incremental delay just compounded. We agree, and we understand that there is some incremental delay from the granting of the easement itself, and we have to deal with that. Remind me, how close is the pipeline right now to 1806? How many more miles have you got to go to get there? We are sort of pretty much at the door of where you are keeping us from working right now as a result of the administrative injunction. So give or take sort of 18 miles or so if you think that 1806 is two miles west from the lake. But again, my point is the same, which is there's going to be some minor delay, we hope, as a result of the easement. That involves pretty much just the crossing under the lake, which with full-time crews could take 60 days. If we're in the position to do that before winter falls, and we're done with all of that work, we'll be in a much better position to get closer to our schedule. The more we have to wait to get to that point, and that point, by the way, is sort of more indifferent to the weather, because drilling HDD under the lake is not quite in the same order of magnitude as having to do open digging in the winter countryside. But the more that we're allowed to get to the point that we need to be, the fewer our injuries are going to be. And the question really is not would this be a reasonable accommodation, but what is the legal entitlement of the tribe to impose $100 million, $200 million, $300 million for the extra two or three weeks that it will take us to catch up with those two miles, in a situation in which we and the government complied with every procedural right that they had. We went the extra mile to accommodate them. We accommodated other tribes. They could have had a lawsuit that established their alleged procedural right earlier, and they waited to bring it until the very end. It is – the conclusion is practically inescapable that, you know, they may have a real care about the sites, I don't doubt it, but they had an opportunity if they're in weak sites to protect them in accordance with the way Congress decided that they should be protected, which is consultation and a weighing of all of the factors by the expert agency. They bypassed that opportunity, and they shouldn't have it now. Thank you, Your Honor. Thank you, Mr. Stattis. Mr. Hasselman – oh, I'm sorry. I'm sorry, Mr. Stasselman. Your Honor, I had that cite for you for where the advisory council's regulations for the court can affirm its decision over the council's objections. It's 36 CFR 800.5C32B. C32B. Thank you. Mr. Hasselman, you had no time left, but we'll give you two minutes. Thank you very much, Your Honor. All right? And so I want to take some of that time immediately because I am curious about something that Mr. Estrada mentioned, which is you did have a right case if your argument was about the scope of what they were doing, and they had said we're not going to do that. Why did the tribe not act on that then? That was two years earlier. Your Honor, I just disagree. To have jurisdiction under the Administrative Procedure Act, there has to be final agency action, and there are clear lines on what that includes. And a preliminary decision on the scope of review would not constitute final agency action. So we had to wait until they made their final decision, which was July 25th, and we filed a lawsuit two days later. Well, one, I am not sure that you couldn't have made an argument for final action on the specific question of the scope, right? I mean, you did disagree about that, and they defined for you what they thought their jurisdiction was. You know, it would be like filing a lawsuit on a draft environmental impact statement or something. I mean, I've been around this tree before. I don't think it would have worked. We had to wait until there was a decision. Okay. Well, let me ask you about another part of this, because there is a bit of correspondence here about they wanted to do some boreholes. Is that correct? Okay. And so basically, you objected to that, or the tribe objected to that and said, no, they went ahead and did it. Wasn't that final, and couldn't you have sued at that point? Could we have sued over the decision on the boreholes? I suppose we could, but we're here talking about the pipeline itself. I'm not sure exactly how we would have shown an injury from digging a hole. Well, I mean, it would have been a way for you to challenge the position that the Corps was taking, because as I understood it, and maybe I don't understand what your argument was, but as I thought what the tribe was saying was, to do that got into this area of potential effects and shouldn't have been done without consultation with the tribe. I'm just looking for, you know, wasn't there a potential for you to have made your point when you did? Well, you're asking two different things. I mean, we made our concerns known from the very first correspondence, and we said, this is a deeply important cultural area for us. It is not an appropriate place for a pipeline. We need to be engaged in the surveys. That's the very first letter that the tribe sent in February of 2015. We need to be involved. We're ready to go out there. So we made our concerns known. Now you're asking, could we have filed a lawsuit? Well, the boreholes didn't present the indirect effects question, because the boreholes were in the middle of the lake. So I think the question presented here about the pipeline wasn't presented at the borehole stage. And your theory about the pipeline, the whole pipeline review is, as I understand it, twofold. One is that the pipeline is the undertaking that depends on the permitting. Go ahead. So there's two ways to get to the same place. One of them is to look at the statutory definition of undertaking, which says federally permitted projects under the direct or indirect jurisdiction of a permitting agency. So that would be one way to get at the question of places outside the Army Corps' direct jurisdiction. The other way to get to the same place is, even if you look at the undertaking as just the area of crossing, that you consider indirect effects. But both of those involve looking at the pipeline route. Now, their view is they've had their agency, the Corps is an agency subject to, you know, deference from us. And they've made a determination about indirect effects that includes this mile buffer. And they've thought about all the different effects. It's sound, it's vibration, it's... And they're, you know, they're talking about effects of the verification, of the easement. And they say that's our view. And your response to that, why isn't that a full taking account of the statutory and regulatory requirements to take into account the area within the indirect effects? So I want to talk about this map and the one mile buffer because I think it's very important. The letter that Mr. Estrada mentioned is our Exhibit 11. And I think it's important to look closely. If you look at this map, you can see that the pipeline route actually goes right through an identified and known site. The print is tiny, but it ends with the numbers 259. And if you look at this letter, our Exhibit 11, Attachment 11, it talks about that site, identifying it as outside of the project area and that it is unevaluated. So here was a known site that wasn't fully evaluated. And this letter could not be clearer that this part of the pipeline route was not within the scope of review of the Section 106 process. The tribe never got out there to evaluate those sites and participate in consultation. They could look in the hole in the ground and they could look at the road. So I think it is important to the extent that the implication is they took a one mile look around. They didn't. They looked at the road and they looked at the hole. Your question about deference I think gets to the question of when we have two agencies that are fundamentally at odds, which one do we defer to? And Congress designated the Advisory Council as the expert on implementing the National Historic Preservation Act and the interpretation of these terms. This is not an engineering judgment. This is a legal question. When did you get this three circles map? When did the tribe know that this was the scope of the area according to the Corps? This was the end of the consultation process. This was on April 22, 2016 when the Army Corps said it was done. As of that date, you knew this is the Corps' view. The Corps' view is this is the area of probable effect. Is that right? I disagree with that clarification for the reasons I just mentioned. But yes, in April 2016 and following the process. What did you disagree? You understood at that time that was the Corps' view of where the area of probable effect was. No, the Corps' view of the area of effect was the hole in the ground and the road. And they came up with this map with circles that nobody's been able to explain what it means or where it comes from. I see. It's not fair to say that you knew that this was the area of probable effect and you had a chance to consult about artifacts within that area. That's not the case? We did not have a chance. In fact, in accordance with the Advisory Council regulations, we filed a formal objection to this. To this? To this. And they said you got it wrong. Who's the then? Yeah, it's important. It's the Advisory Council. There is a process under the Advisory Council regulations. Once a finding of no historic effects determination is made, then there's an objection process. We objected and so did the Advisory Council. So that is our attachments. It is one of our attachments. I believe it is number 12. And then they point to, I believe, if I've got Mr. Mabinette right here, they point to Council Regulation 800.5 C322B, which says Council can address this opinion and that the person to whom that's addressed shall take it into account in reaching a final decision. Basically they're saying we can take it into account and we get to make our decision. We the court. That's the position of the court. Yes. That doesn't immunize it from judicial review. I mean, yeah, the process played out. The Advisory Council said, no, you got it wrong. And they said, yeah, we got it right. I think their point is not that it immunizes it from judicial review, but that it ranks the deference and it renders them the agency ultimately entitled to deference. Do you agree with that? Yeah, I do. If they had made an engineering judgment, I mean, Your Honor, you proposed an alternative of looking at indirect effects. Say there was only one permit, the water crossing, of using the idea of how far back on the pipeline would you have to do something different. Would that be an engineering judgment that could withstand judicial review? Yeah, probably it could. But what they did here was different. They said we're not going to look at any of it. So they made a legal determination that none of the pipeline route was in the scope of review. So in your view, this goes together. You were pointing us to, I think, a December 18, 2014 letter. I'm just a little bit confused about the chronology here. I apologize. The December 18, 2014 letter to Ms. Swenson that you were pointing to is the letter that describes sites that ends in 259 as located outside of the proposed route. No, Your Honor. This is the April 22, 2016 letter. There's a second letter also to Ms. Swenson that, much later, that you say persists in talking about this as outside the route. Yeah. Yeah. I mean, this letter says on page two, the area of potential effects for this project will not, and not as in bold, include construction of any portion of the pipeline alignment that extends past bore pit locations. And then it goes on to say an exception where there's temporary staging areas, which this doesn't include. So this was sort of the end of the consultation process as far as the Army Corps was concerned when it closed the door and said, this is what we looked at, and we didn't find any historic properties in our narrow scope. Okay. Thank you. You've been generous with your time. I appreciate it. Thank you.  Thank you.
judges: Brown, Griffith, Pillard